UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

DALIP KUMAR,
              Defendant.

21-CR-755 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

    Defendant Dalip Kumar was convicted of two counts of money laundering, charges premised on concealing that certain funds were the proceeds of forgery or false use of a passport. Kumar moves for judgment of acquittal based on insufficient evidence under Federal Rule of Criminal Procedure 29 or, in the alternative, a new trial under Federal Rule 33.

**I.  Background**

    Dalip Kumar was charged in an Information with two counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(3)(B) and (2). (ECF No. 20.) In Count One, the Government alleged that, from at least in or about July 2019 through at least in or about September 2019, Kumar conducted and attempted to conduct a financial transaction with the intent to conceal and disguise the nature of property he believed to be the proceeds of forgery and false use of a passport. (*Id.*) Count Two alleged that Kumar violated the same statute in the same manner from in or around January 2021 to in or around February 2021. (*Id.*) Trial commenced with jury selection on April 24, 2023. Jury deliberations began on the afternoon of May 1, 2023, and concluded the same afternoon, with the jury convicting Kumar on both counts. Kumar has moved pursuant to Federal Rules of Criminal Procedure 29 and 33, seeking judgment of acquittal or a new trial. (ECF No. 85 ("Br.") at 33.)

1

## II. Legal Standards

### A. Rule 29

"To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the 'heavy burden' of showing that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'" *United States v. Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013 (summary order) (quoting *United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010)). When evaluating a Rule 29 motion, courts "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999).

### B. Rule 33

Rule 33 motions for a new trial generally "are disfavored in [the Second] Circuit." *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011) (quoting *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995)). "The ultimate test . . . is whether letting a guilty verdict stand would be manifest injustice." *United States v. Aguiar,* 737 F.3d 251, 264 (2d Cir. 2013) (citation omitted). A Rule 33 motion should be granted only if a court concludes there is "a real concern that an innocent person may have been convicted." *Id.* at 264 (citation omitted). However, the Court must balance this against the risk of "wholly usurp[ing]" the province of the jury. *United States v. Polouizzi*, 564 F.3d 142, 162 (2d Cir. 2009) (quotation marks omitted).

## III. Discussion

Kumar contends that the evidence at trial was insufficient to support his conviction. He principally argues that that Government failed to prove beyond a reasonable doubt that he was predisposed to launder money. In the alternative, Kumar argues that he is entitled to a new trial on the grounds of manifest injustice.

### A. Sufficiency of the Evidence

The Court charged the jury that, to establish a violation of 28 U.S.C. § 1953(a)(3)(B), the Government was required to prove the following elements:

> First, the Government must establish beyond a reasonable doubt that Mr. Kumar knowingly conducted or attempted to conduct a financial transaction;
>
> Second, the Government must establish beyond a reasonable doubt that this transaction involved property represented to be, and believed by Mr. Kumar to be, the proceeds of specified unlawful activity [*i.e.*, forgery and/or false use of a passport];
>
> Third, the Government must establish beyond a reasonable doubt that Mr. Kumar acted with intent to conceal or disguise the nature, location, source, or ownership or control of the property.

(Tr. 741.) The Court turns to whether the Government met its burden on each of these elements.

#### 1. Knowledge Element

At trial, there was no dispute that the financial transactions alleged to be money laundering actually did occur. To establish this element beyond a reasonable doubt, the Government relied principally on the testimony of confidential source Sawan Shah ("Shah"), who testified that, at the direction of law enforcement, he approached Kumar and asked Kumar to conduct financial transactions with funds Shah represented to be proceeds of forgery and/or false use of a passport. Shah's testimony is corroborated by, *inter alia*, recordings, chat messages, financial records, and testimony from FBI investigators. Kumar argues that neither Shah's testimony nor the evidence corroborating it was sufficient for a rational jury to find beyond a reasonable doubt that the Government's case satisfied the knowledge element. Kumar's argument is unpersuasive.

The jury heard evidence about how Shah and Kumar came to know one another, which, though uncharged, formed the background for Kumar's knowledge and business. In 2016, Shah

3

became an FBI informant following his conviction for operating an unlicensed check-cashing business, seeking leniency.  At or around that time, Shah informed the FBI that an acquaintance named Mickey Chadha ("Chadha"), who knew about Shah's conviction, had approached Shah and offered to connect him with Kumar, who could "clean" Shah's cash.  (Tr. 240 – 44.)

At the FBI's direction, Shah contacted Chadha, who set up a meeting with Kumar.  On March 15, 2016, under FBI surveillance, Chadha picked up Shah, with whom he proceeded to Kumar's midtown Manhattan perfume store.  (Tr. 246.)  A hidden camera installed on Shah's person captured audio and video.  (GX 101A, 101B, 101C, 101D.)  Recorded audio revealed direct conversation between Shah and Kumar about Shah's illegal "check cashing" business and the "problem" presented by "[t]he tax returns" required by the American government.  (GX 101B-T.)  Kumar charged a nine-percent commission on this and three more financial transactions that he was recorded engaging in for Shah during 2016.  (GX 908.)

Count One of the Information concerned a September 2019 transaction.  Shah, at the direction of the FBI, returned to Kumar's store in July 2019.  (Tr. 130; 258 – 59.)  Kumar promised Shah, "I will get it done."  (GX 104B-T.)  On September 3, 2029, Shah returned to visit Kumar with $60,000 in cash provided by the FBI.  (Tr. 131 – 33, 264 – 74.)

The thrust of Shah's testimony about the September 2019 transaction can be summarized as follows:  "I told him I was in the problem for check cashing, but I'm back now, and this time the money — the source of money is illegal passport."  (Tr. 259.)  Shah also told Kumar that the funds he needed assistance with consisted of "black money," and Kumar himself used the phrase "convert the black into white" to describe his role.  (GX 105C-T; Tr. 271, 366.)  Kumar again charged a nine-percent commission.  (GX 105D-T.)  On September 11, 2019, $54,600 — or ninety-one percent of the cash Shah gave to Kumar — was wired from a Hong Kong account to a

covert bank account set up by the FBI.  (GX 906, 908.)  On the same day, Kumar sent a WhatsApp message to Shah with a picture of the wire information showing $54,600 sent to Precision Labs captioned by the word "Done."  (GX 304.)

This evidence is sufficient for a rational trier of fact to find the knowledge element satisfied.  In addition to the above, Shah also attributed the funds to a fictitious "passport maker" to Kumar.  (GX 104B-T.)  And he was even more explicit, as revealed by one recording:

> Kumar:  Okay.  Right now what work are you doing?
>
> Shah:  Right now there is one friend of mine.
>
> Kumar:  Okay.
>
> Shah:  He does passport and all that.
>
> Kumar:  Okay.
>
> Shah: Uh passport and a person, brings a pigeon.
>
> Kumar: Okay.
>
> Shah:  So his money has to be moved to and fro.
>
> Kumar: Okay.

(GX104B-T.)  According to Shah's testimony, "pigeon" is a slang term for someone who comes to the United States unlawfully from India.[1]  (Tr. 259.)  Shah expressly told Kumar that the money came from a source who "makes passports," something that ensures "he gets a lot of cash."  (GX 104-B-T.)  Shah further informed Kumar that these sums of cash flowed from the ability to charge five to six thousand dollars per passport.  (GX 105D-T.)  And when the two men consummated the transaction, Shah told Kumar that "all the work he does is illegal" to which Kumar responded, "Okay."  (GX 105C-T.)

---

[1] This meaning was corroborated by expert interpreter Ashutosh Mishra.  (Tr. 236.)

Rational jurors could have found the Government satisfied the knowledge element as to Count 1 by sufficient evidence. For the same reasons, sufficient evidence supports the jury's verdict on Count 2, which concerned a similar but later transaction. The principal difference is that the Government introduced more inculpatory recordings and Shah testified to more inculpatory conversations informing Kumar of his illegal activities related to forgery and/or false use of a passport, which he said occurred after the first transaction but before the second. Thus, as to both Counts 1 and 2, the Government's trial evidence was sufficient as a matter of law for the jury to find the knowledge element established beyond a reasonable doubt.

### 2. Intent Element

The Government also was required to establish beyond a reasonable doubt Kumar's intent to conceal the nature, source, ownership, or control of the illicit proceeds of forgery or false use of a passport. Here, those proceeds consisted of cash connected to "dirty" or illegal activities, which the Government sought to prove Kumar "cleaned."

The Government argued to the jury that Kumar's intent to conceal the source of the cash he "cleaned" was established in several ways. First, the two charged transactions were unconnected to any legitimate product or service, and, as discussed above, involved discussion of the illegal nature of, and resulting need to conceal, the nature of the transaction and the parties' relationship. The transactions, moreover, involved foreign corporate counterparties from Hong Kong, Japan, and Singapore, devoid of connection to any legitimate product or service. (GX 903 – 07.) The Government also presented evidence of Kumar instructing Shah on how best to use shell companies not in one's own name to camouflage control, source, and ownership of illegal proceeds to evade detection. (GX 104B-T ("One should never get it done in one's personal [name] . . . . Open it in the company.").) And beginning in 2016 through their final transaction, Kumar and Shah used coded language, agreeing to refer to the cash Kumar moved for Shah's

6

associates not as money but rather as the "property" or the "package." (GX 102-T.) Taken together, this evidence was sufficient for a rational jury to find intent to conceal for both Counts 1 and 2.

Additionally, Kumar gave a voluntary and *Mirandized* post-arrest interview to law enforcement in which he made repeated false or misleading statements to the FBI. Kumar claimed that he never did any business apart from selling perfume and jewelry, that the largest amount of cash he had dealt with was $400, and that he never had business outside the United States. (GX 203-T.) Despite his purported perfume business, however, he was unable to name a single supplier of perfume, ran a story with little or no inventory, and apparently did not ship or advertise. (GX 212-T, GX 204-T, GX 206-T.) He also appeared to contradict his recorded conversations with Shah when he claimed that no one had ever asked him to move money out of the United States for a price. (GX 203-T.) Kumar's attempts to conceal these transactions from the FBI bolster the conclusion that there was sufficient evidence for a rational jury to find the intent to conceal element satisfied as to both Counts 1 and 2.

### 3. Entrapment Defense

Kumar argues that no rational juror could have found that he had not been entrapped into committing the offense, principally because the Government's evidence was insufficient to show Kumar's predisposition to commit the offense beyond a reasonable doubt. (Br. at 20.)

The affirmative defense of entrapment consists of "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *United States v. Cabrera*, 13 F.4th 140, 146 (2d Cir. 2021) (citations omitted). "When a defendant has presented credible evidence of inducement by a government agent, the government has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Id.* Inducement covers situations where the government

has "initiated the crime." *United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006). This includes "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged." *United States v. Sherman*, 200 F.2d 880, 883 (2d Cir. 1952). Showing inducement requires only some evidence that government initiated the crime. *United States v. Braver*, 450 F.2d 799, 805 (2d Cir. 1971). If its burden is triggered, the Government can prove predisposition by presenting evidence of "(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States v. Flores*, 945 F.3d 687, 717 (2d Cir. 2019).

Assuming that Kumar satisfied his burden of producing some evidence of inducement, the evidence was sufficient for a rational jury to find predisposition on the part of Kumar. First, Shah testified that Chadha already knew Kumar as a money launderer and offered to introduce Shah to him for the specific purpose of moving money that was under scrutiny due to Shah's own criminal case. (Tr. 243 – 44.)

Second, Kumar's conduct at his first meeting with Shah in 2016 establishes his readiness and willingness to move money. In that 2016 meeting, Kumar first brought up the exchange of banking information, first brought up his willingness to accept up to $50,000, and promised to Shah that the money would move. Moreover, Kumar's fee negotiations as part of their 2019 transaction constitute additional evidence from which a rational jury could infer his predisposition. Shah asked Kumar if he could do the transaction for "a thousand even," and Kumar immediately responded "I will take a loss on that" — amply supporting the inference that

8

Kumar was familiar with his costs and margins well ahead of contact by Shah.[2] (GX 1010D-T.) Kumar's explanation for why he needed to take a nine-percent commission off the top — that he was "not alone" and had others who worked for him and needed compensation, too — likewise rationally supports the inference that Kumar had a preexisting plan or scheme to launder money. (GX 101D-T.) The Government also presented evidence that Kumar made good on his word, moving large sums of money rapidly, within days of contact from Shah, and through foreign accounts with a deftness and familiarity suggesting readiness and willingness.

In sum, there was sufficient evidence for a rational trier of fact to find Kumar predisposed as to Counts 1 and 2.

### B. Manifest Injustice

Kumar does not advance different substantive arguments in favor of his motion for a new trial under Federal Rule 33; Kumar merely asserts that, for the same reasons as the evidence was insufficient, his conviction amounts to "manifest injustice." (Br. 32 – 33.) For the reasons discussed above, there was sufficient evidence supporting the convictions for Counts 1 and 2 and those convictions do not reflect "manifest injustice" or "exceptional circumstances" warranting a new trial. *United States v. Ferguson*, 246 F.3d 129, 133 – 34 (2d Cir. 2001).

### C. *Hawala*

Kumar argues that the Government's failure to distinguish *hawala*, an informal financial lending system with origins in India, from money laundering under the statute shows

---

[2] Similarly, Kumar argues that because he did not complete a specific wire transfer, the evidence was insufficient as a matter of law to rationally conclude that he had requisite intent as the Government has not specifically shown how Kumar would profit from each transaction. (Br. At 28 – 29.) Statements like this, which evidence a clear business plan and course of dealing, provide a reasonable basis for a jury to have been unpersuaded by these arguments at trial, even assuming that such a showing was part of the Government's burden.

predisposition not to be satisfied as a matter of law. (Br. 29 – 31.) This argument also fails. To the extent that practices associated with *hawala* overlap with conduct covered by the money laundering statutes, the conduct is still illegal. Moreover, the concept played little role at trial. It was defense counsel's opening statement which first introduced the word *hawala*. (Tr. 78 ("[Y]ou're not going to hear the judge say that hawala is illegal.").) On direct, Shah briefly mentioned *hawala*, explaining that it was "[u]nofficially money cleanup to send it to a different country." (Tr. 243.) No additional evidence was presented by either side about *hawala*. While defense counsel mentioned the term in summation (Tr. 655 – 56, 661 – 62, 664 – 65), the Government did not mention *hawala* in any jury address.

The jury instructions made clear the elements of money laundering that the Government was required to prove, and there is no basis for concluding that the jury was confused by the concept of *hawala*.

### IV. Conclusion

For the foregoing reasons, Defendant Dalip Kumar's motion for judgment of acquittal and, in the alternative, for a new trial is denied.

The Clerk of Court is directed to close the motion at ECF Number 85.

SO ORDERED.

Dated: August 21, 2023
New York, New York

_____
J. PAUL OETKEN
United States District Judge